# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jose M. A.,                                           Case No. 21-CV-946 (JFD)

            *Plaintiff,*

v.                                                                **ORDER**

Kilolo Kijakazi,

            *Defendant.*

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jose M. A. seeks judicial review of a final decision by the Defendant Commissioner of Social Security denying his application for disability insurance benefits ("DIB"). The matter is now before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 30) and Defendant's Motion for Summary Judgment (Dkt. No. 33). Plaintiff seeks reversal of the final decision and remand to the Social Security Administration ("SSA") on two grounds: (1) the Administrative Law Judge ("ALJ") erred in determining that his mental impairments were non-severe; and (2) the ALJ erred in considering medical opinion evidence. Defendant opposes Plaintiff's motion and asks the Court to affirm the final decision. For the reasons set forth below, the Court concludes that the ALJ erred in both respects. Therefore, the Court grants Plaintiff's motion, denies Defendant's motion, reverses the final decision, and remands the matter to the SSA for further proceedings.

I.     **Background**

Plaintiff applied for DIB on October 10, 2016, asserting that he became disabled on December 2, 2012,[1] due to back pain, neck pain, limited range of motion and numbness in his left arm, sleep dysfunction, pain radiating down both legs, urinary problems, balance problems and falls, right leg weakness, chronic pain, and depression. (Soc. Sec. Admin. R. (hereinafter "R.") 94–95.)[2] Plaintiff's applications were denied at the initial review and reconsideration stages.

An ALJ held a hearing at Plaintiff's request on November 30, 2018, at which Plaintiff and a vocational expert testified. (R. 55.) The ALJ issued a written decision on February 22, 2019, finding Plaintiff not disabled. (R. 7–21.) Pursuant to the five-step sequential analysis outlined in 20 C.F.R. § 404.1520, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity between his amended onset date of May 16, 2014 through December 31, 2017, the date he was last insured. (R. 12.)

At the second step, the ALJ found that Plaintiff had severe impairments of dysfunction of his major joints, other and unspecified arthropathies; and spine disorders. (R. 12.) The ALJ acknowledged that Plaintiff had a medically determinable mental impairment—specifically, an affective disorder—but determined that it did not cause more than a minimal limitation in Plaintiff's ability to work, and thus was non-severe. (R. 13–

---

[1] This date was later changed to May 16, 2014.
[2] The Social Security administrative record is filed at Dkt. Nos. 25 through 25-18. The record is consecutively paginated, and the Court cites to that pagination rather than docket number and page.

14.) In reaching this conclusion, the ALJ discussed the relevant "Paragraph B" criteria[3] and determined that Plaintiff had only mild limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. (R. 13–14.) The ALJ gave little weight to the opinions of the state agency psychological consultants, Vivian Pearlman, Ph.D., and Russell Ludeke, Ph.D., who each found a moderate limitation in understanding, remembering, or applying information; and moderate difficulties in maintaining concentration, persistence, or pace. (R. 14.) The ALJ acknowledged that the experts were experienced generally but remarked that they had not examined Plaintiff personally. (R. 14.) The ALJ also stated that Plaintiff had "significant, additional treatment" after Dr. Pearlman and Dr. Ludeke offered their opinions, and thus the experts "did not have a longitudinal view of [Plaintiff's] impairments." (R. 14.) Finally, the ALJ found Dr. Pearlman's and Dr. Ludeke's opinions inconsistent with some objective medical evidence. (R. 14.) Because, according to the ALJ, Plaintiff's medically determinable mental impairments resulted in no more than mild limitations in functioning, they were deemed non-severe. (R. 14.)

Proceeding to step three, the ALJ concluded that none of Plaintiff's impairments, alone or in combination, met or medically equaled the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 14.) Before proceeding to step four, the

---

[3] The "Paragraph B" criteria are taken from the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

ALJ assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff had the RFC

> to perform light work as defined in 20 [C.F.R. §] 404.1567(b) except: He can frequently push and pull with the left upper extremity. He can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead bilaterally. He can occasionally reach in front or laterally with the left upper extremity. He can . . . frequently be exposed to hazards such as unprotected heights, dangerous machinery, and commercial driving.

(R. 15.) The ALJ gave little weight to the opinions of Plaintiff's treating physician, Dr. Kelly Collins, finding her opinions inconsistent with other evidence of record. (R. 18.) The ALJ gave very little weight to opinions from physicians who examined Plaintiff exclusively in connection with Plaintiff's workers' compensation claim,[5] including an opinion from Dr. Thomas Nelson. (R. 19.)

With the above RFC, the ALJ concluded, Plaintiff could not perform his past jobs as a heavy equipment operator, truck driver, or construction laborer. (R. 19–20.) Thus, the ALJ proceeded to step five and determined that Plaintiff could successfully adjust to other work existing in significant numbers in the national economy such as counter clerk, bakery worker, and usher. (R. 21.) Consequently, Plaintiff was not disabled. (R. 21.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 1.) This made the ALJ's decision the final decision of the Commissioner for the purpose of judicial review.

---

[4] RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).
[5] Plaintiff was involved in a motor vehicle collision in September 2011 while working as a truck driver. (R. 594.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB, the claimant must establish that he was unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have

lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.   Discussion

### A.   Whether the ALJ Erred by Not Deeming Plaintiff's Mental Impairment Severe at Step Two of the Sequential Evaluation

Plaintiff argues the ALJ erred by not deeming his mental impairment a severe impairment at the second step of the sequential evaluation. Plaintiff relies on the opinions of Dr. Pearlman and Dr. Ludeke, specifically their opinions that Plaintiff had moderate limitations in maintaining attention and concentration for extended periods, in persistence and pace for detailed or complex tasks, and in responding appropriately to changes in the work setting and handling stress in a detailed or complex work setting. (Pl.'s Mem. at 18; R. 118, 123, 150–51.) Plaintiff also faults the ALJ for not considering other evidence of mental health treatment he received, including admission to a partial hospitalization program for depression and low GAD-7 and PHQ-9[6] scores. (*Id.* at 19.) Defendant responds that Plaintiff failed to prove a severe mental impairment at step two, but even if he had, he has not shown that any harm occurred from the error since the ALJ continued with the sequential evaluation. (Def.'s Mem. at 6–7.)

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."

---

[6] "GAD" is an acronym for generalized anxiety disorder, and "PHQ" is an acronym for Patient Health Questionnaire. GAD-7 and PHQ-9 questionnaires are completed independently by a patient and are intended to reflect subjective, self-reported symptoms. *Amy R. v. Saul*, No. 19-CV-1508 (KMM), 2020 WL 3077502, at *1 (D. Minn. June 10, 2020).

*Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard." *Id.* The claimant's burden has also been described as "*de minimis*." *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989). If an ALJ rates a "Paragraph B" limitation as "mild," the ALJ will generally conclude that the corresponding impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

Plaintiff filed his application for DIB before March 27, 2017, which means that 20 C.F.R. § 404.1527 (not the newer, post-March 27, 2017 standards set forth in 20 C.F.R. § 404.1520c) governed the ALJ's evaluation of Dr. Pearlman's and Dr. Ludeke's opinions. Under § 404.1527, ALJs generally give "more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." § 404.1527(c)(1). More weight is also given to opinions from treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . consultative examinations . . . ." § 404.1527(c)(2). The ALJ reduced the weight given to Dr. Pearlman's and Dr. Ludeke's opinions because they did not examine or treat Plaintiff, and this was permissible under the applicable regulation.[7] On the other hand, the ALJ also acknowledged Dr. Pearlman's and Dr. Ludeke's knowledge and expertise in the assessment of functionality as it pertains to disability. (R. 14.) "State agency medical and psychological

---

[7] Interestingly, the ALJ did not reduce the weight given to the opinions of the state agency *physical* consultants based on the lack of an examining or treating relationship, but indicated that their expertise counterbalanced these factors. (*See* R. 17–18.)

consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." *See* SSR 96-6p, 1996 WL 374180, at \*2 (S.S.A. July 2, 1996).

The ALJ found Dr. Pearlman's and Dr. Ludeke's opinions inconsistent with some objective medical evidence, which the ALJ said supported only mild mental functioning limitations. (R. 14.) Generally, inconsistency with other evidence is a permissible reason to reduce the weight given to an opinion. *See* § 404.1527(c)(4). But several of the records to which the ALJ cited were not inconsistent with Dr. Pearlman's and Dr. Ludeke's opinions.

The first such record is a psychiatric progress note by Dr. Juan C. Belalcezar Canal that reflects a referral by Dr. Collins, who indicated that Plaintiff was "in need of psychiatric and psychological services to improve his quality of life and improve function. Please evaluate and treat." (R. 1090.) According to the progress note, Plaintiff told Dr. Belalcezar that he was depressed and sad since the motor vehicle accident. (R. 1091.) It is true that a mental status examination was generally normal, but Dr. Belalcezar noted that Plaintiff's mood was dysphoric and sad. (R. 1095–96.)[8] Dr. Belalcezar thought that Plaintiff's low mood and anhedonia were psychological consequences of his accident, and did not believe Plaintiff was malingering. (R. 1097.) Dr. Belalcezar also thought Cymbalta and psychotherapy could help manage Plaintiff's symptoms. (R. 1097.) Plaintiff's

---

[8] These two pages are the only pages cited by the ALJ in the decision, but the Court includes additional information from the same progress note for full context.

diagnoses included an adjustment disorder, with depressed mood and psychological factors affecting his medical condition. (R. 1098.)

The second record cited by the ALJ is a progress note by Dr. Belalcezar two months later. The mental status examination was generally normal,[9] but GAD-7 and PHQ-9 questionnaires completed by Plaintiff showed that nearly every day he had little interest in doing things, felt depressed and hopeless, had trouble falling asleep, had little energy, had poor appetite, felt bad about himself, felt anxious, and could not stop worrying. (R. 1267–68.) Dr. Belalcezar found that Plaintiff had a recurrent and severe major depressive disorder and that Plaintiff met a state statutory definition for a "serious and persistent mental illness." (R. 1269–70.) Dr. Belalcezar also certified the need for admission to a partial hospitalization program ("PHP"), finding that PHP services were "medically necessary to improve [Plaintiff's] condition and functional level to prevent relapse or hospitalization. No less intensive level of care would be sufficient . . . ." (R. 1269–70.)

The other records cited by the ALJ are mental status examination summaries from progress notes, but these summaries differ from the summaries in the first two progress notes in that they report a constricted affect, anxious mood, and impaired concentration (R. 1276); anxious mood, impaired concentration, poor insight, poor judgment, and poor motivation (R. 1278); and demoralized motivation. (R. 1290.)

---

[9] This section was the only one cited by the ALJ, but the Court includes additional information from the same progress note for full context.

On the whole, the medical evidence cited by the ALJ as inconsistent with Dr. Pearlman's and Dr. Ludeke's opinions was in fact consistent with their opinions. Thus, the ALJ erred in reducing the weight given to those opinions for this reason.

The ALJ also decreased the weight given to Dr. Pearlman's and Dr. Ludeke's opinions because Plaintiff supposedly had "significant, additional treatment" after Dr. Pearlman's opinion of December 30, 2016 and Dr. Ludeke's opinion of February 7, 2017. (R. 14.) The record submitted to the Court, however, does not contain any evidence of "significant, additional treatment" of Plaintiff's mental impairments. The only evidence of treatment dated after the opinions are progress notes related to Plaintiff's physical impairments and records of Plaintiff's vocational rehabilitation. Those records, if anything, are consistent with Dr. Pearlman's and Dr. Ludeke's opinions that Plaintiff had moderate limitations in understanding, remembering, or applying information; and maintaining concentration, persistence, or pace. (*E.g.*, 1799 (noting Plaintiff was the longest test-taker ever for several sections of customer service assessment), 1802 (noting depression and chronic pain may have affected vocational testing results), 1818 (noting struggles with understanding written language), 1847 (noting inability to complete job application within the 50-minute timeframe).) Thus, the ALJ erred in this respect, as well.

The Court now proceeds to the ALJ's consideration of the four "Paragraph B" criteria. As support for the ALJ's conclusion that Plaintiff had only a mild limitation in each of the four areas, the ALJ cited to the same few pages of the record that the ALJ used to justify giving little weight to the opinions of Dr. Pearlman and Dr. Ludeke. (R. 14–15 (citing R. 1095–96, 1267–68, 1276, 1278, 1290, 1296).) Because the ALJ relied on the

same evidence, the Court's discussion in the preceding paragraphs applies equally here. To wit, the cited pages from two of the progress notes cannot fairly be considered in isolation but should be considered with all the progress notes. Other progress notes cited by the ALJ are actually not consistent with a finding of a mild limitation in that they document a dysphoric and sad mood, constricted affect, anxious mood, impaired concentration, poor insight, poor judgment, poor motivation, an adjustment disorder, a severe major depressive disorder, a finding that Plaintiff had a "serious and persistent mental illness," and a certification for admission to a PHP. The ALJ's citation to these progress notes as evidence of mild limitations was erroneous.

There is other medical evidence of a mental impairment, too, relevant to whether Plaintiff can meet his de minimis burden at step two. For example, the discharge summary from the PHP identifies Plaintiff's mental "problems" as a major depressive disorder, recurrent episode, severe; and posttraumatic stress disorder. (R. 1272.) The reason for Plaintiff's admission to the PHP was "an increase in depression symptoms." (R. 1272.) During Plaintiff's participation in the PHP, he reported decreased interests, energy, concentration, and appetite; feeling down, depressed, anxious, frustrated, worried, and hopeless; and difficulty sleeping and nightmares about the accident. (R. 1272.) The medication Cymbalta was prescribed for his depression upon his discharge. (R. 1273.) Follow-up recommendations included Adult Rehabilitative Mental Health Services ("ARMHS"), individual therapy, and medication management. (R. 1274.)

In addition, Dr. Collins opined in November 2015 that "[t]here is a psychiatric/psychological component to patient's pain behaviors which makes work more

challenging. Patient currently working with Psychiatry and I have referred again for psychology services. Mental health appears to be a limiting factor in pain perception and ability to work." (R. 1684.) A progress note from September 2016 documented that Plaintiff "continue[d] to have high depression and anxiety"; his concentration was impaired; and his insight, judgment, and motivation were poor. (R. 1278.) His identified mental problems were a severe major depressive disorder and "severe anxious distress." (R. 1279.) The Court does not intend to reweigh the evidence by identifying these records, but on remand, the ALJ may wish to consider them.

The Court now turns to other, non-medical evidence relevant to the second step of the sequential evaluation process. (*See* Pl.'s Mem. at 19.) "Because the content on a [GAD-7] or PHQ is derived exclusively from the patient's subjective complaints, it is subject to being credited or discredited for the same reasons as other subjective complaints." *Sheila A. v. Berryhill*, No. 17-CV-2161 (HB), 2018 WL 4572982, at *4 (D. Minn. Sept. 24, 2018), *aff'd*, 802 F. App'x 228, 2020 WL 1970545 (8th Cir. 2020). Although the GAD-7 and PHQ-9 questionnaires "are subjective evidence, they are still relevant to the disability determination." *Amy R.*, 2020 WL 3077502, at *1.

At the second step, the ALJ did not consider Plaintiff's subjective statements about his mental health symptoms and whether those statements were consistent with the medical evidence and other evidence of record. An ALJ must consider a claimant's symptoms at step two of the sequential evaluation when evaluating whether an impairment is severe. 20 C.F.R. § 404.1529(d); SSR 16-3p, 2016 WL 1119029, at *10 (S.S.A. Mar. 16, 2016). To the extent the Commissioner would argue that the ALJ considered Plaintiff's subjective

statements later in the decision, when assessing RFC, the ALJ did not consider Plaintiff's statements about his mental health symptoms, including the symptoms reported on the GAD-7 and PHQ-9 questionnaires.

In sum, the Court finds that the ALJ erred in several respects at step two and that remand is appropriate. On remand, the ALJ should reconsider the weight that should be given to Dr. Pearlman's and Dr. Ludeke's opinions, consider Plaintiff's subjective statements about his mental health symptoms, and reassess the "Paragraph B" criteria. The Court finds the errors were not harmless, because the ALJ did not consider the effects or functional limitations of the mental impairments, or Plaintiff's statements about his mental health symptoms, later in the sequential evaluation. *See Barber v. Saul*, No. 4:19-CV-2701-ACL, 2021 WL 1088098, at *8 (E.D. Mo. Mar. 22, 2021); *Perrin v. Berryhill*, No. 4:16-CV-04178-LLP, 2017 WL 7050670, at *22 (D.S.D. Nov. 27, 2017), *R. & R. adopted*, 2018 WL 560219 (D.S.D. Jan. 23, 2018).

### B.    The ALJ's Assessment of Plaintiff's RFC

Plaintiff argues that the ALJ erred in evaluating the medical opinions of Dr. Collins, Dr. Nelson, and the state agency physical consultants. (Pl.'s Mem. at 1, 20.)

#### 1.    Dr. Collins

Plaintiff began treatment with Dr. Collins in 2013 for back and neck pain. (R. 594.)[10] An MRI from 2012 showed a mild fissure and bulge, mild facet arthropathy, and mild disc

---

[10] Although the relevant time period is between the onset of disability date, May 16, 2014, and the date last insured, December 31, 2017, evidence outside that window may be considered if it relates to Plaintiff's medical conditions during the relevant timeframe. *See Hensley v. Colvin*, 829 F.3d 926, 929 (8th Cir. 2016).

degeneration. (R. 594.) Based on this MRI and a physical examination of Plaintiff, Dr. Collins assessed Plaintiff with neck and back pain due to the motor vehicle collision; neck pain resulting from mild degenerative disc disease; a misalignment of the pelvis with sacroiliac joint dysfunction and associated myofascial pain syndrome and muscle spasms; cervicalgia exacerbated by poor posture and possibly whiplash injury; impaired biomechanics while walking; radicular symptoms, but no evidence of radiculopathy on the MRI or examination; and interrupted sleep. (R. 596.) Dr. Collins recommended physical therapy, home exercise, and pain medications, and believed Plaintiff could resume working in about six months. (R. 596.)

Plaintiff had another MRI in April 2014, which revealed mild disc degeneration, and minimal or mild degenerative facet arthropathy, and mild acute inflammatory changes. (R. 1609.) Sacroiliac joints were unremarkable, and intervertebral discs and facet joints were normal. (R. 1609.) There was no evidence of spinal canal stenosis, neural foraminal stenosis, fracture, infection, tumor, or arachnoiditis. (R. 1610.)

Plaintiff attended 13 physical therapy appointments with Anne Hultgren from April to June 2014. (R. 579.) Plaintiff consistently reported sharp spasms and pain in his low back, leg pain and weakness, left elbow pain. (*E.g.*, R. 557, 559, 567, 569.) Hultgren observed the muscle spasms, which decreased when she worked on his back, and reported that his tolerance to activity was "very limited." (R. 570.) Hultgren also observed radiating pain in Plaintiff's legs, neck, and arms. (R. 572.) After Plaintiff's final session, Hultgren commented that his back and leg symptoms remained "elevated" and recommended that Plaintiff use a four-wheeled walker with a seat and handbrakes. (R. 579.)

In June 2014, Dr. Collins recommended that Plaintiff could return to work with the following restrictions: lifting a maximum of 10 pounds occasionally, 1 to 5 pounds frequently, and 15 pounds rarely; avoiding highly repetitive bending to reach items below the knee; changing positions frequently; and using proper body mechanics. (R. 1638.) In a progress note from September 2014, Dr. Collins noted that Plaintiff might need a walker if he returned to work, but he did not use an assistive device at the appointment. (R. 606.) Dr. Collins thought diagnostic or therapeutic injections could help with pain control. (R. 606.) On examination, Plaintiff had a tight gait pattern; straight leg raise was normal; strength was limited in hip flexion on the right, limited by pain; range of motion in the back was poor; rotation was poor; and pain worsened with extension. (R. 606.)

Plaintiff underwent medial branch block injections on October 3, 2014. (R. 727.) He reported no improvement 11 days later. (R. 736.) The administering provider recommended a steroid injection (R. 737), which Plaintiff had on November 21, 2014 (R. 740). A progress note dated December 15, 2014, documented increased pain after that injection. (R. 1125.) Meanwhile, in November 2014, Dr. Collins opined that Plaintiff had the following permanent work restrictions: lifting a maximum of 10 pounds occasionally, 1 to 5 pounds frequently, and 15 pounds rarely; avoiding highly repetitive bending to reach items below the knee; changing positions frequently; using proper body mechanics; and lying down about 10 to 15 minutes every two hours. (R. 1653.)

Plaintiff returned to Dr. Collins in January 2015. (R. 1128.) He described shooting pain and nerve pain down both legs, neck pain, elbow pain, and back pain. (R. 1128.) He reported wearing a back brace all the time. (R. 1128.) He had fallen recently due to back

pain and fractured his elbow. (R. 1129.) On examination, Plaintiff used a cane and moved slowly. (R. 1128.) His range of motion was extremely poor, and his back and neck muscles were tight and tender. (R. 1129.) A straight-leg-raise test was positive. (R. 1129.) Dr. Collins thought Plaintiff had reached maximum medical improvement, recommended discontinuing the back brace and restarting physical therapy, and ordered a functional capacity evaluation ("FCE") to confirm her recommendations for permanent restrictions. (R. 1129.)

In March 2015, Plaintiff underwent an FCE based on Dr. Collins' referral. The identity of the evaluator is unknown because the signature is illegible. (R. 1753, 1761.) All lifting tests increased Plaintiff's back pain and caused concern due to balance issues, and thus the evaluator's restrictions included no repetitive lifting. (R. 1749.) Other limitations included that Plaintiff could sit only up to 33% of the time during a workday and would need frequent breaks every 20 minutes, could not stand or walk for prolonged periods, and could never crawl, kneel, crouch, or squat. (R. 1750.) Plaintiff could occasionally bend or stoop, crawl, climb heights, reach above the shoulder level, and push or pull. (R. 1760.) He could occasionally lift or carry up to 10 pounds. (R. 1760–61.)

At a follow-up appointment, Dr. Collins noted that she had reviewed the FCE, and the only additional concern she had was for Plaintiff's balance. (R. 1132.) Specifically, she thought he would need a cane or walker to return to work. (R. 1132.) Otherwise, she agreed with the FCE and the permanent work restrictions. (R. 1132.)

In July 2015, Plaintiff told Dr. Collins he was getting weaker, used a walker or cane, and needed to lie down periodically to relieve his back spasms. (R. 1133.) Plaintiff also

reported a new one-to-two-pound lifting restriction due to the elbow injury. (R. 1133.) Dr. Collins noted that Plaintiff's "pain and dysfunction [were] definitely out of proportion to his MRI" and thought that Plaintiff's pain could have a psychological component. (R. 1133–34.) There were notable pain behaviors, and when he moved, he had "a shaky, almost tremor-like motion." (R. 1134.)

In September 2015, Plaintiff reported pain radiating down both legs, falling, and increased weakness. (R. 1136.) Dr. Collins noted there was "no medical reason for his pain at this point, and patients who have chronic pain syndromes and psychological sequelae do better if they are able to work in some capacity." (R. 1136.) Dr. Collins' assessments included neck pain with myofascial pain, and she had a "[h]igh concern for chronic pain syndrome" that she believed should be addressed through psychiatric treatment. (R. 1136.) She also thought Plaintiff would benefit from an inpatient chronic pain management program. (R. 1136.) Dr. Collins educated Plaintiff about "the relationship between our neurochemicals and our physical nociceptive pain and how the psychiatric proportion of pain can outweigh the physical portion." (R. 1134.)

On November 18, 2015, Dr. Collins authored a report-to-work ability letter that endorsed the physical work restrictions set forth in the FCE. (R. 1684.) Two years later, however, Dr. Collins opined that Plaintiff could work with the following restrictions: lifting no more than 10 pounds occasionally, 1 to 5 pounds frequently, and 15 pounds rarely; no repetitive bending to reach below the knee; changing positions frequently; using proper body mechanics; no commercial driving; and working up to 4 hours a day on nonconsecutive days, up to 3 days a week. (R. 1417.)

17

The ALJ gave Dr. Collins' various opinions little weight for the following reasons: (1) one of the opinions was based on an FCE "rather than her own judgment"; (2) she stated in September 2015 that Plaintiff had no medical reason for his pain and that working would be beneficial; and (3) her opinions were inconsistent with MRIs, other diagnostic evidence, and physical examinations showing "some reduced range of motion" but no radicular symptoms. (R. 18.)

> Under 20 C.F.R. § 404.1527, ALJs generally give
>
> more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). If the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." *Id.* When a treating source's medical opinion is not given controlling weight, the ALJ considers the factors listed in § 404.1527(c) to determine the proper weight to give the opinion: the existence and length of an examining relationship, the frequency of examination, the extent and nature of the treatment relationship, the supportability of the opinion, the consistency of the opinion with other record evidence, the specialization of the source, and any other factors that might be relevant. § 404.1527(c)(1)–(6). An ALJ is not required to discuss each and every factor as long as the ALJ gives good reasons for the weight assigned. *Alaa M. K. A. v. Saul*, No. 20-CV-1066 (SRN/HB), 2021 WL 3023743,

at *8 (D. Minn. July 1, 2021), *R. & R. adopted*, 2021 WL 3022699 (D. Minn. July 16, 2021); *Belinda B. v. Saul*, No. 20-CV-488 (JRT/LIB), 2021 WL 537932, at *8 n.6 (D. Minn. Jan. 28, 2021), *R. &. R. adopted*, 2021 WL 533689 (D. Minn. Feb. 12, 2021).

The Court finds the ALJ erred in evaluating Dr. Collins' opinions for the following reasons. Beginning with the FCE, the ALJ failed to acknowledge that it was Dr. Collins who ordered the FCE for the purpose of confirming the physical functional limitations she had already determined. Furthermore, a physician's reliance on objective findings in an FCE that she ordered but was conducted by another provider is no different than a physician's reliance on an MRI that she ordered but was conducted by another provider. In either circumstance, the objective medical findings or diagnostic criteria would support and be consistent with the physician's medical opinion, not detract from it. Additionally, only Dr. Collins' November 2015 opinion incorporated the FCE limitations; the November 2014 and November 2017 opinions did not. (R. 1417, 1653, 1684.) Thus, Dr. Collins' reliance on the FCE "rather than her own judgment," as the ALJ put it, would not have been a reason to discount the weight given those two opinions.

Next, the ALJ erred in her consideration of Dr. Collins' statements in September 2015 that Plaintiff had no medical reason for his pain and that working could be beneficial. It is clear from the context of the entire progress note (and numerous other treatment records from Dr. Collins) that Dr. Collins meant there were no imaging results or objective findings that could fully explain Plaintiff's pain, but that she believed Plaintiff had a chronic pain syndrome that could be addressed by an inpatient chronic pain program or psychiatric treatment. (R. 1136.) "Chronic pain syndrome 'has both a physical and

psychological component.'" *Bates v. Apfel*, 69 F. Supp. 2d 1143, 1148 (N.D. Iowa 1999) (quoting *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995)). "Pain merges into and becomes a part of the mental and psychological responses that produce the functional impairments. The components are not neatly separable." *Lester*, 81 F.3d at 829. Thus, it is not possible to isolate the effects of the physical impairment from the effects of the mental impairment. *Id.* at 830. The physical component of Plaintiff's pain originated with the motor vehicle accident in 2011 when Plaintiff injured his back and neck. Plaintiff also fell and injured his left elbow. But there was also a psychological component to Plaintiff's pain, as Dr. Collins discovered and documented. The ALJ's failure to consider the psychological component of Plaintiff's pain when evaluating Dr. Collins' opinions was an error.

The ALJ's reliance on the lack of diagnostic evidence to discount Dr. Collins' opinions was similarly flawed. EMGs and MRIs would not detect the psychological component of a chronic pain syndrome. And, as for Dr. Collins' physical examination findings, those were largely consistent with a chronic pain syndrome.

Turning to Dr. Collins' comment that patients with chronic pain syndrome "do better if they are able to work in some capacity," Dr. Collins did not say that Plaintiff could work fulltime and at any exertional level. The comment was entirely consistent with Dr. Collins' opinion in November 2017 that Plaintiff could, with certain restrictions, work up to four hours a day on nonconsecutive days, up to three days a week. (R. 1417.) Thus, the ALJ erred by finding Dr. Collins' comment inconsistent with other evidence from Dr. Collins.

On remand, the ALJ should reevaluate the weight due to Dr. Collins' opinions, in light of the errors identified above.

### 2.    State Agency Physical Consultants

State agency physical consultants Gregory Salmi, M.D., and Paul Ossman, M.D., opined that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours; sit for 6 hours; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs; and occasionally reach overhead or in front with the left extremity. (R. 17–18.) The ALJ gave great weight to these opinions because of the doctors' expertise in assessing functionality relative to making disability determinations and because the opinions were consistent with objective medical evidence such as diagnostic testing and physical examinations. (R. 18.)

The ALJ's reasons for the weight given Dr. Salmi's and Dr. Ossman's opinions are valid under § 404.1527(c)(4) and (5), but it is possible that the ALJ's evaluation could change based on the reevaluation of Dr. Collins' opinions. Thus, while the Court does not find that the ALJ erred in evaluating Dr. Salmi's and Dr. Ossman's opinions, the ALJ should reevaluate these opinions if warranted by the reevaluation of Dr. Collins' opinions.

### 3.    Dr. Nelson

In connection with Plaintiff's workers' compensation claim, Dr. Nelson conducted an independent medical examination and opined that Plaintiff would be limited to sedentary work and lifting no more than 10 pounds, among other limitations. (R. 1174.) The ALJ gave very little weight to Dr. Nelson's opinion for the reasons that (1) the standards for determining disability for workers' compensation differ from those for

determining DIB; (2) opinions for workers' compensation benefits typically either favor the individual or the insurance company; and (3) the opinion was not consistent with other evidence of record. (R. 19.)

An opinion given in connection with a workers' compensation claim may be considered just like another other medical opinion. *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000) ("Although Dr. Yellin's examination was performed in connection with a workers' compensation claim, the ALJ was entitled to consider this opinion in relation to Prosch's social security claim."). "That a medical opinion was issued in connection with another disability proceeding does not change th[e] general rule" that an ALJ must evaluate medical source opinions. *Slater v. Kijakazi*, No. 20-CV-4038-KEM, 2022 WL 884920, at *4 (N.D. Iowa Mar. 24, 2022); *see also* 20 C.F.R. § 404.1527 ("Regardless of its source, we will evaluate every medical opinion we receive."). The difference between the disability standards for workers' compensation claims and DIB claims is not reason alone to discount the opinion. *Slater*, 2022 WL 884920, at *4. This is especially true for findings in the opinion that relate to a claimant's ability to function in the workplace. *Id.*; *Holdeman v. Kijakazi*, No. 20-CV-729-NKL, 2021 WL 6062368, at *6 (W.D. Mo. Dec. 22, 2021). In the instant case, the ALJ did not evaluate Dr. Nelson's opinion separately but reduced the weight of all workers' compensation reports and opinions because they were issued in the workers' compensation context. The law does not support that across-the-board determination.

Finally, as to the consistency of the medical evidence, the ALJ cited to diagnostic testing and physical examination findings to reduce the weight given to Dr. Nelson's

opinion. It is possible this finding could change in light of the reevaluation of Dr. Collins' opinion and the psychological component of Plaintiff's pain. Thus, while the Court does not find that the ALJ erred in reducing the weight of Dr. Nelson's opinion for this particular reason, reconsideration of it may be warranted on remand.

## IV.    Conclusion

The ALJ erred at step two of the sequential evaluation in considering Plaintiff's mental impairments and at step four in evaluating medical opinions. Reversal of the final decision and remand to the Social Security Administration is warranted. On remand, the ALJ must reconsider at the second step of the sequential evaluation whether Plaintiff's mental impairments are severe impairments by reevaluating the weight to be given to Dr. Pearlman's and Dr. Ludeke's opinions, considering Plaintiff's subjective statements about his mental health symptoms, and reassessing the "Paragraph B" criteria. The ALJ must also reevaluate as part of the RFC assessment the medical opinions of Dr. Collins and Dr. Nelson. The ALJ should then trace the consequences of these errors through his opinion. The ALJ's reevaluation and reconsideration of evidence could affect the validity of the RFC assessment, the hypothetical question that was posed to the vocational expert at the hearing, and the vocational expert's resulting testimony about the jobs Plaintiff could do. If the ALJ's RFC assessment differs on remand, the ALJ should propound a new hypothetical question to a vocational expert.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Summary Judgment (Dkt. No. 30) is **GRANTED**.

2.      Defendant's Motion for Summary Judgment (Dkt. No. 33) is **DENIED**.

3.      The decision of the Commissioner of Social Security is **REVERSED** and the

matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for

further administrative proceedings consistent with this Order. Specifically,

the ALJ must reconsider at the second step of the sequential evaluation

whether Plaintiff's mental impairments are severe impairments by

reevaluating the weight to be given to Dr. Pearlman's and Dr. Ludeke's

opinions, considering Plaintiff's subjective statements about his mental

health symptoms, and reassessing the "Paragraph B" criteria. The ALJ must

also reevaluate as part of the RFC assessment the medical opinions of Dr.

Collins and Dr. Nelson. If the ALJ's RFC assessment differs on remand, the

ALJ should propound a new hypothetical question to a vocational expert.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date:  July 20, 2022                      _s/  John F. Docherty_____
                                          JOHN F. DOCHERTY
                                          United States Magistrate Judge